UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/14/2025
```

-------------------------------------------------------------------- X
                                                                     :
MIRCAL,                                                              :
                                                                     :
                                        Plaintiff,                   :           1:25-cv-622-GHW
                                                                     :
                    -against-                                        :           MEMORANDUM
                                                                     :           OPINION & ORDER
MICHAEL FLACKS,                                                      :
                                                                     :
                                        Defendant.                   :
                                                                     :
-------------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

     On April 30, 2024, a French company under Defendant Michael Flacks's control executed a Securities Purchase Agreement (the "SPA") with Plaintiff Mircal to acquire a number of Mircal's paper-production businesses, including a Mircal subsidiary that owned a kaolin mine in the State of Pará, Brazil (the "Mine"). Flacks personally guaranteed €15 million worth of the upfront purchase price in the SPA (the "Guaranty"). The terms of his guarantee were as broad as they were unequivocal: Flacks's coverage of the purchase price was absolute, unconditional, and irrevocable; he expressly waived any legal defenses he may have to the guarantee's enforceability against him; and he specifically agreed that any determination that the SPA was unenforceable or invalid would have no effect on his liability to Mircal. While the SPA is governed by French law, the Guaranty is governed by the laws of the state of New York.

     The purchase went south. Shortly after Flacks's company assumed control of the Mine, the governor of Pará revoked the Mine's license, citing longstanding regulatory and environmental concerns that Flacks argues were concealed from him and his companies as the SPA was negotiated. Flacks's companies are currently challenging the validity and enforceability of the SPA in a litigation in France. They argue that Mircal fraudulently concealed the regulatory concerns with the Mine, and

in the meantime, they have refused to pay more than €9.5 million worth of the SPA's upfront purchase price.

That is France.  Here, in New York, the question is not whether the SPA is valid or enforceable, but whether Flacks can avoid the ironclad terms of his unconditional guarantee of the upfront purchase price.  He cannot.  Because the Guaranty unambiguously requires payment of the upfront purchase price regardless of the validity or enforceability of the SPA or the Guaranty, Flacks must pay Mircal the €9.5 million that remains outstanding.  For the reasons set forth below, Mircal's motion for summary judgment under the Guaranty is GRANTED.

## I.    BACKGROUND[1]

### A.  The Parties

Plaintiff Mircal is a *société par actions simplifiée*—a "joint stock simplified company" organized and registered in Paris, France.  Dkt. No. 21 ¶ 2 (Mircal Rule 56.1 Statement of Facts, hereinafter "Mircal SOF").  Mircal is the holding company of Imerys Group, Dkt. No. 28 ¶ 5 ("Gassenheimer Declaration"), a minerals supplier that includes among its entities "Imerys Asia Pacific, Imerys Canada, Imerys Clays, Imerys Mineraux Belgique, Imerys Minerals International Sales, Imerys Mineral Limited, and Parimetal" (collectively, the "Vendors"), Dkt. No. 23 ¶ 62 (Michael Flacks Rule 56.1 Statement of Facts, hereinafter "Flacks SOF").

Defendant Michael Flacks is the founder, chairman, and CEO of Flacks Group.  Dkt. No. 25 ¶ 1 ("Flacks Declaration").  Flacks Group owns Artemyn Minerals France, a company formerly known as Pleuger Minerals France ("Artemyn").  Gassenheimer Declaration ¶ 4; Flacks Declaration, Ex. 2 at 1.

---

[1] The facts are drawn from the parties' Local Rule 56.1 statements and other documents submitted in connection with the parties' cross-motions for summary judgment.  They are undisputed in relevant part unless otherwise noted.

### B. The Securities Purchase Agreement

On April 30, 2024, Artemyn entered into a Securities Purchase Agreement with Mircal and the Vendors (the "SPA").  Mircal SOF ¶ 7; Dkt. No. 20 ("Papapetrou Declaration"), Ex. 2 (SPA, excerpted); Gassenheimer Declaration, Ex. 2 (SPA, excerpted).  The SPA was the product of several months of negotiations and due diligence conducted by Flacks Group, Artemyn, and Imerys Group. *See* Flacks SOF ¶¶ 56–62.  Pursuant to the SPA, Artemyn purchased securities in various entities within the Imerys Group that owned "assets serving the paper market."  Flacks SOF ¶ 56; Mircal SOF ¶ 9.  Among other things, Artemyn acquired the shares of a company that owned a kaolin[2] mine in the State of Pará, Brazil (the "Mine").  Flacks SOF ¶¶ 56-63.

The "total consideration" for the securities Artemyn purchased under the SPA "amount[ed] to a maximum of EUR 145,000,000."  SPA § 3.1(a).  Included in that amount was an "Upfront Purchase Price" of up to €15,000,000, *id.* § 3.2(a), which was to be paid "in three (3) instalments" of €5,000,000, *id.* § 3.2(b).  The first instalment was due on July 5, 2024, when the transaction closed, Mircal SOF ¶ 11 n.1; *see* SPA § 3.2(b)(i), the second instalment was due on October 3, 2024, Flacks SOF ¶ 95; *see* SPA § 3.2(b)(ii), and the third instalment was due on December 31, 2024, Mircal SOF ¶ 27; SPA § 3.2(b)(iii).  On December 16, 2024, the amount due in the third instalment of the Upfront Purchase Price was "reduced from EUR 5,000,000 to EUR 4,506,000" because one of the securities listed in the SPA "was not transferred" to Artemyn.  Mircal SOF ¶ 48.

Artemyn was required to pay the Upfront Purchase Price "in accordance with and subject, as the case may be, to the adjustments set forth in the provisions of Clauses 3.5(e), 4.4 and 5.4."  SPA § 3.2(a).  The applicability of Section 3.5(e) to the Upfront Purchase Price is disputed in this case.

---

[2] The parties' materials do not explain what kaolin is.  According to the Encyclopedia Britannica, kaolin is a "soft white clay that is an essential ingredient in the manufacture of china and porcelain and is widely used in the making of paper, rubber, paint, and many other products."  *Kaolin*, Encyclopedia Britannica, Mar. 11, 2025, https://www.britannica.com/science/kaolin.

Dkt. No. 19 at 12 n.4 ("Memorandum"); Dkt. No. 22 at 11–14 ("Opposition"); Dkt. No. 29 at 2–4 ("Reply"). Section 3.5 provides a process for determining the "net cash level" present in the companies that the Vendors sold to Artemyn under the SPA. As part of the SPA, "the Vendors agreed to guarantee a net cash level for all the companies" being sold to Artemyn. Flacks SOF ¶ 65. If the net cash level in the companies was too low at the time of the sale, Artemyn was owed a credit in the amount of the deficiency. *See* SPA § 3.5(e)(i). If the net cash level in the companies was higher than the guaranteed level at the time of sale, the Vendors were owed a credit in the amount of the excess. *See id.* § 3.5(e)(ii). A credit to a party corresponding to the companies' net cash levels is called the "Final Net Cash Adjustment Amount." *Id.* § 3.5(e).

Section 3.5 sets out a four-step procedure for determining whether either party is entitled to a Net Cash Adjustment. First, within ten business days after the due date of the first instalment of the Upfront Purchase Price, "the Vendors Agent [sic] shall prepare and deliver to [Artemyn]" a "Draft Net Cash Statement" setting forth, among other things, the companies' purported net cash levels, any corresponding Net Cash Adjustment Amounts, and "such reasonable details and evidence as the Vendors' Agent may have to support such calculations." *Id.* § 3.5(a). Second, within thirty business days of receiving the Draft Net Cash Statement, Artemyn "shall notify the Vendors' Agent whether or not it accepts" the purported net cash levels and corresponding net cash adjustment amounts proposed in the draft. *Id.* § 3.5(b). If Artemyn "does not accept any such amounts," it must provide "reasonable details and evidence and relevant calculation as [Artemyn] may have to object to the calculation of such items." *Id.* Third, if there is a dispute regarding the net cash levels or Net Cash Adjustment Amounts, "the Vendors' Agent and [Artemyn] shall attempt in good faith to reach an agreement" on the disputed amounts. *Id.* § 3.5(c). And fourth, "if they are unable to do so within ten [business days]," the parties must refer the dispute to certain "Reporting Accountants" designated in Schedule 3.7(c) of the SPA. *Id.*

4

The completion of those four steps would ensure that the Draft Net Cash Statement, and the net cash levels and Net Cash Adjustment Amount within it, become a "Final Net Cash Statement." *Id.* § 3.5(d). "Where (i) [Artemyn] is satisfied with the Draft Net Cash Statement (either as originally submitted by the Vendors' Agent or after adjustments agreed between the Vendors' Agent and [Artemyn]) or where the Purchaser fails to notify the Vendors' Agent . . . within [thirty business days], or (ii) the Draft Net Cash Statement has been adjusted by the Reporting Accountants . . . then the Draft Net Cash Statement (incorporating any agreed adjustments) shall become final (the 'Final Net Cash Statement') for the purposes of the Agreement . . . ." *Id.*

Once a Final Net Cash Statement is established, any corresponding credits to the parties are paid out in accordance with Section 3.5(e). Section 3.5(e) provides that "[w]ithin five (5) Business Days, starting the day the Final Net Cash Statement is issued in accordance with this Clause 3.5, the following payments shall be made:"

> (i)    if the Final Net Cash Adjustment Amount is [owed to Artemyn], the absolute value of the Final Net Cash Adjustment Amount shall be paid (i) first by way of set off against any outstanding portion of the Upfront Purchase Price under Clause 3.2, and (ii) then by way of set off against the principal amount of the Working Capital Loan already put at the disposal of [Artemyn], in accordance with the terms and conditions of the Working Capital Loan Agreement, and (iii) then in cash for any excess amount by the Vendors to [Artemyn] by wire transfer to [Artemyn's] bank account whose details shall have been previously notified to the Vendors' Agent.

> (ii)   if the Final Net Cash Adjustment Amount is [owed to Mircal and the Vendors], the value of the Final Net Cash Adjustment Amount shall not be paid by [Artemyn] but left in the Group Companies and shall be considered as an additional tranche of the Working Capital Loan already put at the disposal of [Artemyn], not bearing any interest and excluded from the guarantee from the Parent and the Pledge Agreements granted as securities in connection with the amounts owed under the Working Capital Loan, in accordance with the terms and conditions of the Working Capital Loan Agreement (the "Excess Cash Senior Vendor Loan").

*Id.* § 3.5(e).

So, if a Final Net Cash Statement is issued and the statement provides that Artemyn is owed

a credit because the net cash levels in the companies it purchased were too low, that credit is paid according to the priority list set forth in Section 3.5(e)(i). First, if there is "any outstanding portion of the Upfront Purchase Price" that remains to be paid, the credit to Artemyn is paid "by way of set off" against the outstanding amount. *Id.* Second, if no amount of the Upfront Purchase Price remains outstanding, the credit to Artemyn is paid "by way of set off against the principal amount of the Working Capital Loan already put at the disposal of [Artemyn]."[3] *Id.* And third, if Artemyn is owed more based on the companies' net cash levels than there is left in the Working Capital Loan, the credit to Artemyn is paid "in cash for any excess amount . . . by wire transfer." *Id.* If a Final Net Cash Statement is issued and the statement provides that Mircal and the Vendors are owed a credit because the net cash levels in their companies exceeded the guaranteed levels, that credit is "left in the [companies] and shall be considered as an additional tranche of the Working Capital Loan already put at the disposal of [Artemyn]." *Id.* § 3.5(e)(ii).

The SPA provides that it is governed by French law, SPA § 24(a), and that "the Commercial Court of Paris shall have exclusive jurisdiction to settle any disputes" arising therefrom, *id.* § 24(b).

### C. The Guaranty

On April 29, 2024, Michael Flacks executed a Personal Guaranty of certain of Artemyn's obligations to Mircal under the SPA. Papapetrou Declaration, Ex. 1 (the "Guaranty"). The obligations that Flacks guaranteed in the Guaranty were termed the "Guaranteed Obligations." *Id.* § 2.

Among other Guaranteed Obligations, Flacks "absolutely, unconditionally and irrevocably guarantee[d]" the payment to Plaintiff of the Upfront Purchase Price as and when it became due

---

[3] In addition to executing the SPA with Mircal and the Vendors, Artemyn entered into a "Working Capital Loan Agreement" with Mircal under which Mircal "agreed to make available to [Artemyn] a loan in the maximum principal amount of twenty million euros (€20,000,000)" to be repaid by Artemyn "in accordance with the terms of the Loan." Dkt. No. 20-1 at 1. The Working Capital Loan and its terms are not at issue in this case.

under the SPA:

> [Flacks] hereby absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely a surety . . . payment to [Mircal] of the [Upfront Purchase Price][4] as and when the same becomes due in accordance with the terms and provisions of the SPA, whether at stated maturity, by acceleration or otherwise . . . .

*Id.* § 2.

Flacks further agreed that no "determination of lack of enforceability or invalidity" of any agreements "related to or attendant with" the Upfront Purchase would "discharge or diminish all or any part of" his guaranty thereof:

> <u>Guaranty Unconditional</u>. [Flacks] acknowledges and agrees that no change in the nature or terms of the Guaranteed Obligations or any of the agreements, instruments or contracts evidencing, related to or attendant with the Guaranteed Obligations (including any novation), nor any determination of lack of enforceability or invalidity thereof, shall discharge or diminish all or any part of the liabilities and obligations of [Flacks] pursuant to this Guaranty except as expressly provided therein; it being the purpose and intent of [Flacks] and [Mircal] that the covenants, agreements and all liabilities and obligations of [Flacks] hereunder are absolute, unconditional and irrevocable under any and all circumstances. . . .

*Id.* § 6. There is no dispute in this case that the SPA is an agreement "related to or attendant with" Flacks's guarantee of the Upfront Purchase Price. *See* Opposition at 11–12 (not disputing that this provision relates to the SPA). The Guaranty specifically invokes the SPA in connection with Flacks's guarantee of the Upfront Purchase Price. Guaranty at 1 (providing that Artemyn "will enter into that certain Securities Purchase Agreement, dated on or about the date hereof (the 'SPA') . . . pursuant to which [Artemyn] undertakes to pay the Vendors the Upfront Purchase Price . . .").

Flacks also "expressly waive[d] and surrender[ed] any defense to [his] liability" under the Guaranty:

> [Flacks], to the extent permitted by applicable law, hereby expressly waives and surrenders any defense to its liability hereunder, or any right of reduction, limitation, impairment, defense (including, without limitation, defenses of failure of

---

[4] The Guaranty defines Flacks's guarantee of the Upfront Purchase Price as the "Cash Price Obligation." Guaranty at 1. Both parties consistently refer to the Cash Price Obligation simply as Flacks's guaranty of the Upfront Purchase Price. *See, e.g.,* Memorandum at 4; Opposition at 5. The Court will do the same.

> consideration, breach of warranty, statute of frauds, statute of limitations, accord and satisfaction and usury), counterclaim or offset of any nature or description which it may have or which may exist based upon, and shall be deemed to have consented to, any of the foregoing acts, omissions, things, agreements or waivers.

*Id.* And he agreed that "no statement, representation, agreement or promise" other than those contained in the Guaranty had induced him to execute the Guaranty:

> <u>Guaranty Final</u>.  Upon execution and delivery of this Guaranty to [Mircal], this Guaranty shall be deemed to be finally executed and delivered by [Flacks] and shall not be subject to or affected by any prior or concurrent promise or condition affecting or limiting [Flacks's] liability, and no statement, representation, agreement or promise heretofore made on the part of [Mircal], [Artemyn], or either of them, or any officer, employee or Beneficiary thereof unless contained herein forms any part of this Guaranty or has induced the making thereof or shall be deemed in any way to affect [Flacks's] liability hereunder.

*Id.* § 4.

The Guaranty provides that Flacks's payments of the Guaranteed Obligations must be made "within a maximum period of 10 calendar days from receipt by [Flacks] of a request for payment sent to [Flacks] by [Mircal] . . . ." *Id.* § 10.  Interest accrues on unpaid amounts at a rate of 10% per year:

> If [Flacks] fails to perform any of its payment obligations under the Guaranty on the due date, it will be liable to [Mircal], in addition to the sum indicated in the relevant Payment Request, for late payment interest calculated on this sum at the rate of 10% per year . . . .

*Id.* Flacks is also responsible for any "out-of-pocket costs and expenses, including attorney costs, incurred by [Mircal] in obtaining performance of or collecting payments due" under the Guaranty:

> All out-of-pocket costs and expenses, including attorney costs, incurred by [Mircal] in obtaining performance of or collecting payments due under this Guaranty shall be deemed part of the Guaranteed Obligations guaranteed hereby.  [Flacks] agrees to pay or reimburse [Mircal] for all its out-of-pocket costs and expenses incurred in collecting against [Flacks] under this Guaranty or otherwise enforcing or preserving any rights under this Guaranty and the other Transaction Documents to which the Guarantor is a party, including, without limitation, the attorney costs, to [Mircal].

*Id.* § 19.

### D.  The Dispute

The transaction contemplated in the SPA closed on July 5, 2024.  Flacks SOF ¶ 72.  On that date, Artemyn paid the first €5,000,000 instalment of the Upfront Purchase Price, Mircal SOF ¶ 28, and assumed control over the Mine, *see* Flacks SOF ¶¶ 61, 72.  On July 12, 2024, one week later, the Secretariat of Environment and Sustainability of the State of Pará ("SEMAS") suspended the Mine's operating license.  *Id.* ¶ 72.[5]  SEMAS issued the suspension in part based on failures to comply with social and environmental regulations "imposed by SEMAS at [the Mine] prior to the closing of the SPA transaction."  *Id.* ¶ 73.  Defendant argues that the Vendors deliberately concealed SEMAS's social and environmental concerns regarding the Mine from Artemyn prior to the execution of the SPA.  Opposition at 6–7.

On July 19, 2024, Mircal provided a Draft Net Cash Statement to Artemyn in accordance with Section 3.5(a) of the SPA.  Gassenheimer Declaration ¶ 26.  On August 30, 2024, Artemyn provided Mircal with objections to the Draft Net Cash Statement in accordance with Section 3.5(b).  *Id.* ¶ 29; *see* SPA § 3.5(b) ("[Artemyn] shall notify the Vendors' Agent whether or not it accepts the . . . Net Cash Adjustment Amount set out in the Draft Net Cash Statement within thirty (30) Business Days of receiving it . . . .").  Artemyn's objections contended, among other things, that Mircal and the Vendors had underspent on various tax obligations and capital expenditures in a manner that improperly inflated the cash levels in the entities they sold to Artemyn.  Gassenheimer Declaration, Ex. 4, Schedule 1.  The objections claimed that Mircal owed Artemyn €9,536,470.59 in Net Cash Adjustments as compensation for the under-investments.  *Id.* at 1.

On September 11, 2024, pursuant to Section 3.5(c) of the SPA, Mircal sent Artemyn a letter

---

[5] Plaintiff does not dispute the accuracy of Defendant's factual assertions regarding the revocation of the Mine's operating license, but argues that they are not relevant because they cannot be introduced to alter the unambiguous language in the Guaranty and the SPA.  *See* Dkt. No. 30 ¶¶ 72–80 ("Mircal Reply SOF").  The relevance of these extracontractual facts is addressed *infra* in Parts II and III.

providing "answers to the disputed items set out in" Artemyn's objections "with a view to resolving in good faith such disputed items and reach[ing] a final resolution . . . ."  Gassenheimer Declaration, Ex. 13 at 1–2; *see* SPA § 3.5(c) ("Where [Artemyn] notifies the Vendors' Agent . . . that it does not accept the Draft Net Cash Statement . . . the Vendors' Agent and [Artemyn] shall attempt in good faith to reach an agreement in respect of the . . . Net Cash Adjustment Amount set out in the Draft Net Cash Statement within thirty (30) Business Days of receiving it . . . .").  The parties did not reach an agreement on the proper Net Cash Adjustment Amount within the 10-business-day window provided in Section 3.5(c).  *See* SPA § 3.5(c); Gassenheimer Declaration, Ex. 14 at 2.

As discussed, under Section 3.5(c) of the SPA, the next step toward reaching a Final Net Cash Adjustment Amount once the parties did not reach an agreement in good faith was to refer "the items remaining in dispute" to certain Reporting Accountants designated in Section 3.7(c). SPA § 3.5(c).  On October 4, 2024, Mircal sent Artemyn a letter recognizing the absence of an agreement between the parties on the Net Cash Adjustment Amount and "proposing to mutually appoint a reporting accountant under the SPA."  Gassenheimer Declaration ¶ 62; Gassenheimer Declaration, Ex. 14 at 2.  The letter attached the resumes of two proposed Reporting Accountants to address the parties' disputes.  Gassenheimer Declaration, Ex. 14 at 2–3.

Artemyn responded to Mircal's letter on October 14, 2024.  Gassenheimer Declaration, Ex. 16.  Artemyn rejected Mircal's proposals on the ground that they were "based on the SPA," whose "validity [Artemyn] precisely challenged" and whose cancelation Artemyn was considering seeking in court.  *Id.* at 1.  Artemyn did not provide an alternative to Mircal's proposed Reporting Accountants or otherwise indicate that it intended to continue the process of obtaining a Final Net Cash Statement in accordance with Section 3.5.  *Id.* at 1–2.  No Final Net Cash Statement has been issued.

*See* Opposition at 14; Reply at 3.[6]

Meanwhile, "[o]n October 10, 2024, Mircal sent Artemyn and Flacks Group a letter demanding payment of the second instalment of the Upfront Purchase Price." Flacks SOF ¶ 95. Pursuant to the SPA, the second €5,000,000 instalment of the Upfront Purchase Price was due on October 3, 2024. *Id.*; *see* SPA § 3.2(b)(ii). On October 16, 2024, Artemyn notified Mircal that it refused to pay the second instalment. Flacks SOF ¶ 96. Artemyn stated that it was "seriously consider[ing] seeking the annulment of the SPA and the underlying transaction" based on the Vendors' alleged concealment of the regulatory concerns regarding the Mine. Gassenheimer Declaration, Ex. 17 at 2.

The third and final instalment of the Upfront Purchase Price was due on December 31, 2024. Mircal SOF ¶ 27; SPA § 3.2(b)(iii). Artemyn did not pay the third instalment. Mircal SOF ¶ 49. Accordingly, in total, €9,506,000 of the Upfront Purchase Price provided in the SPA has not been paid. *See id.* ¶¶ 28–29, 49.

### E. Procedural History

On December 20, 2024, Mircal brought an action under the Guaranty against Flacks in the Supreme Court of the State of New York, County of New York (the "State Action"). Dkt. No. 1-1. At the time, the third instalment of the Upfront Purchase Price was not yet due. *See* Mircal SOF ¶ 27 (noting that the third instalment of the Upfront Purchase Price was due on December 31, 2025). Mircal's complaint, accordingly, sought €5,000,000, the amount of the second instalment of the Upfront Purchase Price, plus interest, attorneys' fees, and costs. Dkt. No. 1-1 at 10–12.

---

[6] In his Rule 56.1 Statement of Material Facts, Flacks states that he "disputes that 'no Final Net Cash Statement has been issued under the SPA,' as the Final Net Cash Statement . . . remain[s] in dispute between Artemyn and Plaintiff." Flacks SOF ¶ 43. Flacks's statement that any Final Net Cash Statement "remain[s] in dispute" is a concession that no Final Net Cash Statement has been issued. Because Flacks's purported dispute regarding the existence of a Final Net Cash Statement is "conclusory" and "unsubstantiated," it does not suffice to raise a "a genuine issue as to any material fact." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotations omitted).

Mircal moved immediately for summary judgment in the State Action rather than filing a complaint. *Id.* at 1. It did so pursuant to N.Y. C.P.L.R. ("CPLR") § 3213, which permits a plaintiff to "serve the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint" in cases where "an action is based upon an instrument for the payment of money only or upon any judgment." Mircal contended that expedited summary judgment under CPLR § 3123 was appropriate because it sought damages that followed directly from the plain language in the Guaranty. *See* Dkt. No. 1-1 at 1–2.

On January 21, 2025, Flacks removed the State Action to this Court. Dkt. No. 1. The Court has subject matter jurisdiction over this action because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(2). For purposes of diversity jurisdiction, Mircal is a citizen of France, where it is incorporated and has its principal place of business, Dkt. No. 1 ¶ 13, and Flacks is a citizen of Florida, where he "resides and is domiciled," *id.* ¶ 12. Mircal seeks well over $75,000 under the Guaranty. *E.g.*, *id.* ¶ 1.

Mircal moved for summary judgment in this Court on March 7, 2025. Dkt. No. 18 (Motion); Dkt. No. 19 (Memorandum); Dkt. No. 20 (Papapetrou Declaration); Dkt. No. 21 (Mircal SOF). Because the third instalment of the Upfront Purchase Price was due on December 31, 2024, Mircal's summary judgment motion seeks €9,506,000—the sum of the second and third instalments—plus interest, attorneys' fees, and costs. Memorandum at 25. Flacks opposed Mircal's motion on April 4, 2025. Dkt. No. 22 (Opposition); Dkt. No. 23 (Flacks SOF); Dkt. No. 24 ("Povolny Declaration"); Dkt. No. 25 (Flacks Declaration); Dkt. No. 26 ("Agostinho Declaration"); Dkt. No. 27 ("de Souza Declaration"); Dkt. No. 28 (Gassenheimer Declaration). Mircal replied on April 18, 2025. Dkt. No. 29 (Reply); Dkt. No. 30 (Mircal Reply SOF).

On February 4, 2025, Artemyn initiated an action under the SPA against Mircal and Imerys in Paris, France, pursuant to the SPA's venue clause (the "French Action"). Gassenheimer

Declaration ¶ 69; SPA § 24(b) (providing that "the Commercial Court of Paris shall have exclusive jurisdiction to settle any disputes arising out of [the SPA]").  In the French Action, Artemyn alleges, among other things, that Mircal and Imerys fraudulently concealed regulatory concerns regarding the Mine when negotiating the SPA.  Gassenheimer Declaration ¶ 69; Povolny Declaration, Ex. 1 at 5.  One of Flacks's arguments against granting summary judgment under the Guaranty in this case is that there remains a genuine dispute about the validity of the obligations in the SPA, *see* Opposition at 18–19, and accordingly, that there remains a genuine dispute about the validity of Flacks's guarantees of the obligations in the SPA, *see id.* at 19–21.  He argues that the unconditional language and sweeping waiver of defenses in the Guaranty do not foreclose a defense of fraudulent concealment against the enforceability of the Guaranty.  *Id.* at 20–21.

## II.    LEGAL STANDARD

### A.  Summary Judgment under Fed. R. Civ. P. 56(a)

As discussed, when Plaintiff initiated the State Action, it moved for summary judgment pursuant to the expedited summary-judgment procedures provided in CPLR § 3213.  Dkt. No. 1-1 at 1.  Because "§ 3213 is a procedural rule, . . . when this case was removed to federal court, the regime of the Federal Rules replaced that of § 3213."  *Com/Tech Commc'n Techs., Inc. v. Wireless Data Sys., Inc.*, 163 F.3d 149, 151 (2d Cir. 1998) (citing Fed. R. Civ. P. 81(c)).  Plaintiff's motion for summary judgment in this court, accordingly, is governed by Federal Rule of Civil Procedure 56.  *Id.*; *Bank of Baroda v. Harsh Imports, Inc.*, No. 22-cv-2257 (GHW), 2023 WL 2601613, at *4 (S.D.N.Y. Mar. 22, 2023).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit

under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The party moving for summary judgment bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If that initial burden is satisfied, the burden "shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim." *Id.* To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd.*, 247 F.3d at 428 (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

### B. Contract Interpretation under New York Law

New York law governs this dispute. The Guaranty provides that it is governed by New

York law, Guaranty § 23, and "[t]he parties' briefs assume that New York substantive law governs the issues presented here," *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quotation marks and alterations omitted). The parties' "implied consent is . . . sufficient to establish the applicable choice of law." *Id.* (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001).

Under New York law, the "primary objective" in interpreting a contract "is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (quoting *Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)) (quotation marks and alternations omitted). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks and alterations omitted)).

As a "threshold question," courts applying New York contract law must consider "whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quotation omitted). A contract is ambiguous under New York law if "there is a reasonable basis for a difference of opinion as to [its] meaning." *Selective Ins. Co. of Am. v. Cnty. of Rensselaer*, 26 N.Y.3d 649, 655–56 (2016). It is unambiguous if there is none. *Id.*; *accord, e.g., Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569–70 (2002).

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (quotation omitted). Conversely, "where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered." *JA Apparel*, 568 F.3d at 397. "[W]hen a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." *Amusement Bus. Underwriters, a Div. of Bingham & Bingham, Inc. v. Am. Int'l Grp., Inc.*, 66 N.Y.2d 878, 880 (1985). "This generally means that a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Id.*; *accord Compagnie Financière*, 232 F.3d at 158.

## III.    DISCUSSION

The Guaranty unambiguously requires Flacks to pay Mircal the €9,506,000 that Artemyn has not paid in Upfront Purchase Price instalments, in addition to interest, attorneys' fees, and costs. The Guaranty also unambiguously forecloses Flacks's asserted fraud defense against its enforcement. Because there is no genuine dispute of fact regarding Flacks's liability to Mircal under the Guaranty, Mircal is entitled to summary judgment.

### A.  There is No Genuine Dispute of Material Fact Regarding Flacks's Liability Under the Guaranty

Summary judgment is appropriate here because there is no genuine dispute of material fact regarding Flacks's liability to Mircal under the Guaranty. "On a motion for summary judgment to

16

enforce a written guaranty, all that the creditor need prove is an absolute and unconditional

guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty." *City of

New York v. Clarose Cinema Corp.*, 681 N.Y.S.2d 251 (1st Dep't 1998); *accord Cooperatieve Centrale

Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 492 (2015) (quotation omitted).  There is no

dispute that the Guaranty exists.  *E.g.*, Flacks SOF ¶ 1.  And under the plain terms of the Guaranty,

Flacks owes Mircal €9,506,000 in Upfront Purchase Price instalments, Guaranty § 2, interest on

those instalments "at the rate of 10% per year," *id.* § 10, and "[a]ll out-of-pocket costs and expenses,

including attorney costs, incurred by [Mircal] in obtaining performance of or collecting payments

due under [the] Guaranty," *id.* § 19.  As discussed, Flacks agreed in the Guaranty to guarantee

Artemyn's payment of the Upfront Purchase Price "as and when the same becomes due in

accordance with the terms and provisions of the SPA, whether at stated maturity, by acceleration or

otherwise."  *Id.* § 2.  The SPA undisputedly provides that a €5,000,000 instalment of the Upfront

Purchase Price was due on October 3, 2024, Flacks SOF ¶ 95; *see* SPA § 3.2(b)(ii), and that another

€4,506,000 instalment was due on December 31, 2024, Mircal SOF ¶¶ 27, 48; SPA § 3.2(b)(iii).

Artemyn undisputedly paid neither.  *See, e.g.*, Flacks SOF ¶ 54.  Because Flacks guaranteed the

payment of both instalments "as and when" they became due under the SPA, and because Artemyn

did not pay either instalment, Flacks is liable for the full amount of the instalments, plus the interest,

attorneys' fees, and out-of-pocket costs provided in Sections 10 and 19 of the Guaranty.  Guaranty

§§ 2, 10, 19.

There is also no genuine dispute of fact that Flacks is not entitled to a setoff from the

Upfront Purchase Price under Section 3.5(e) of the SPA.  Flacks does not dispute that Section 3.2(b)

of the SPA requires Artemyn to pay the second and third instalments of the Upfront Purchase Price,

Flack SOF ¶¶ 26–27, but contends that there remains a dispute regarding whether Artemyn—and by

extension, Flacks—was entitled to a setoff from those instalments pursuant to Section 3.5(e) of the

17

SPA, Opposition at 13–14.  As described above, the SPA provides for payment of the Upfront

Purchase Price "in accordance with and subject . . . to the adjustments set forth in the provisions of

Clauses 3.5(e), 4.4 and 5.4 . . . ."  SPA § 3.2(a).  Section 3.5(e), in turn, provides that within five

business days "starting after the day the Final Net Cash Statement is issued in accordance with this

Clause 3.5," "payments shall be made" to reimburse the party who is entitled to the Final Net Cash

Adjustment Amount, if any, provided in the Final Net Cash Statement.  *Id.* § 3.5(e).  If the Final Net

Cash Statement provides that Artemyn is entitled to a Final Net Cash Adjustment Amount, that

amount "shall be paid (i) first by way of set off against any outstanding portion of the Upfront

Purchase Price under Clause 3.2," "(ii) then by way of set off against the principal amount of the

Working Capital Loan already put at the disposal of [Artemyn]," and "(iii) then in cash for any

excess amount . . . ."  *Id.* § 3.5(e)(i).

Artemyn is not entitled to a setoff from the Upfront Purchase Price under Section 3.5(e)

because Section 3.5(e) has no effect until "*after* the Final Net Cash Statement is issued in accordance

with [Section] 3.5," *id.* § 3.5(e) (emphasis added), and there is no dispute that the Final Net Cash

Statement has not been issued, Flacks SOF ¶ 43.  As described above, Section 3.5 sets out a

multistep procedure that the parties must follow in order to issue a Final Net Cash Statement.  *See*

*generally supra* Part I.B.  That procedure is not complete.  The parties completed the first three steps

in Section 3.5:  Mircal provided a Draft Net Cash Statement to Artemyn, SPA § 3.5(a); *see*

Gassenheimer Declaration ¶ 26, Artemyn provided objections to Mircal, SPA § 3.5(b); *see*

Gassenheimer Declaration ¶ 29, and the parties discussed and failed to resolve Artemyn's objections

in good faith, SPA § 3.5(c); *see* Gassenheimer Declaration, Ex. 13 at 1–2.  The next step, according

to Section 3.5, is to refer "the items remaining in dispute . . . to the Reporting Accountants in

accordance with Schedule 3.7(c)" of the SPA.  SPA § 3.5(c).  But when Mircal sent Artemyn a letter

proposing two Reporting Accountants for referral and attaching their resumes, Gassenheimer

Declaration ¶ 62; Gassenheimer Declaration, Ex. 14 at 2, Artemyn rejected the proposals, provided

no potential alternative Reporting Accountants, and stated that it challenged the validity of the SPA

and that it might seek its cancelation, Gassenheimer Declaration, Ex. 16 at 1–2.

Pursuant to Section 3.5(d) of the SPA, the Draft Net Cash Statement provided by Mircal will

not "become final" until it "has been adjusted by the Reporting Accountants in accordance with

paragraph (c)." SPA § 3.5(d). Artemyn's refusal to refer the parties' dispute regarding the Draft Net

Cash Statement to a Reporting Accountant, accordingly, ensured that no Final Net Cash Statement

was issued. *See* Gassenheimer Declaration, Ex. 16 at 1–2. Artemyn's initial objections to Mircal's

Draft Net Cash Statement do not suffice to trigger the payment provisions in Section 3.5(e). Section

3.5(e) applies after the issuance of the Final Net Cash Statement, not after Artemyn's objections. *See*

SPA § 3.5(e) ("Within five (5) Business Days, starting *after* the day the Final Net Cash Statement is

issued in accordance with this Clause 3.5, the following payments shall be made . . ." (emphasis

added)). Because there is no dispute that no Final Net Cash Statement has been issued, Section

3.5(e) has no effect on Artemyn's obligation to pay the Upfront Purchase Price under the SPA, SPA

§ 3.5(e) (emphasis added), nor on Flacks's guarantee of Artemyn's obligation to pay the Upfront

Purchase Price in the Guaranty, Guaranty § 2.

Artemyn is not without recourse under Section 3.5(e) if a Final Net Cash Statement is issued

after the Upfront Purchase Price is paid and provides that Artemyn is owed a Net Cash Adjustment.

Section 3.5(e) expressly provides that Artemyn's Net Cash Adjustment is set off against other

obligations if no portion of the Upfront Purchase Price remains outstanding. Pursuant to Section

3.5(e)(i), a setoff "against any outstanding portion of the Upfront Purchase Price" is the "first"

option for paying any adjustments owed to Artemyn, but if no such setoff is available, adjustments

are to be paid "by way of set off against the principal amount of [Artemyn's] Working Capital

Loan," and failing that, "in cash for any excess amount . . . by wire transfer." SPA § 3.5(e)(i). There

is no question, based on the hierarchy of payments set out in Section 3.5(e)(i), that the SPA does not require the Upfront Purchase Price to remain outstanding while a Final Net Cash Statement is sorted out. Flacks's guarantee of the outstanding instalments of Upfront Purchase Price in the Guaranty, accordingly, is unaffected by the provisions in Section 3.5(e).

### B. The Unambiguous Language in the Guaranty Precludes Any Defenses Flacks Asserts Against His Liability under the Guaranty

The plain language in the Guaranty forecloses any defenses Flacks may have against his obligation to ensure payment of the Upfront Purchase Price, *see* Guaranty §§ 2, 4, 6, including the fraud-based defenses he has asserted here, *see* Opposition at 18–21. "Guaranties that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims, i.e., guaranties that are 'absolute and unconditional,' have been consistently upheld by New York courts." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 493 (2015) (quoting *Citibank v. Plapinger*, 66 N.Y.2d 90, 92 (1985)) (collecting cases). "Absolute and unconditional guaranties have . . . been found to preclude guarantors from asserting a broad range of defenses under New York law," *Compagnie Financière*, 188 F.3d at 35 (collecting cases), including defenses which are "ultimately based on a quintessential defense of fraud," *Navarro*, 25 N.Y.3d at 495; *see also Plapinger*, 66 N.Y.2d at 92 (holding that "absolute and unconditional" language in guaranty foreclosed fraudulent-inducement defense). The New York State Court of Appeals "has acknowledged the application of these absolute guaranties even to claims of fraudulent inducement in the execution of the guaranty . . . ." *Navarro*, 15 N.Y.3d at 493.

As the Court of Appeals explained in *Plapinger*, and then again in *Navarro*, permitting a guarantor to assert a defense that he agreed to foreclose in the guaranty would "in effect condone [the guarantor's] own fraud in deliberately misrepresenting his true intention when putting his signature to his 'absolute and unconditional' guarantee." *Navarro*, 25 N.Y.3d at 495 (quoting *Plapinger*, 66 N.Y.2d at 95) (quotations and alterations omitted). Accordingly, "where a guaranty

provides that it is 'absolute and unconditional irrespective of any lack of validity or enforceability of the agreement or any other circumstance which might otherwise constitute a defense,' the guarantor is precluded from asserting a defense as to the 'existence of a valid underlying debt.'" *136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*, 644 F. App'x 10, 12 (2d Cir. 2016) (quoting *Navarro*, 25 N.Y.3d at 494–95) (summary order).[7]

The Guaranty in this case is indistinguishable from the guarantees that the Court of Appeals enforced in *Navarro* and *Plapinger*. Like the guarantee in *Navarro*, the Guaranty forecloses "in broad, sweeping and unequivocal language . . . any challenge to the enforceability and validity of the documents which establish defendant's liability for payments arising under the purchase agreement, as well as to any other possible defense to his liability for the obligations . . . ." *Navarro*, 25 N.Y.3d at 494. As described above, the Guaranty provides that Flacks's guarantees of Artemyn's obligations are "absolute, unconditional, and irrevocable in any and all circumstances." Guaranty § 6; *see also id.* § 2 (providing that Flacks agrees to "absolutely, unconditionally and irrevocably guarantee[] . . . payment to [Mircal] of the [Upfront Purchase Price] as and when the same becomes due in accordance with the terms and provisions of the SPA . . ."); *Navarro*, 25 N.Y.3d at 493 (explaining that "guaranties that are 'absolute and unconditional,' have been consistently upheld by New York courts" (quoting *Plapinger*, 66 N.Y.2d at 92)). It provides that no "determination of lack of enforceability or invalidity [of the SPA] shall discharge or diminish all or any part of the liabilities and obligations of [Flacks] pursuant to this Guaranty except as expressly provided therein." Guaranty § 6; *see Plapinger*, 66 N.Y.2d at 95 (enforcing guaranty where the guaranty provided that its

---

[7] *Accord, e.g.*, *Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*, No. 19-cv-2519 (PKC), 2021 WL 6092462, at *8 (S.D.N.Y. Dec. 22, 2021), *aff'd*, 82 F.4th 161 (2d Cir. 2023) (granting summary judgment where guarantor had "waived any defense to enforcement of the guaranty as against it" in the guaranty); *605 Fifth Prop. Owner, LLC v. Abasic, S.A.*, No. 22-3195, 2023 WL 4417343, at *2 (2d Cir. July 10, 2023) (similar); *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, 662 F. App'x 19, 22 (2d Cir. 2016) (similar); *Clarke v. TRIGO U.S., Inc.*, No. 22-cv-1917 (PKC), 2023 WL 6806074, at *5 (S.D.N.Y. Oct. 16, 2023) (similar); *Valley Nat. Bank v. Greenwich Ins. Co.*, 254 F. Supp. 2d 448, 458 (S.D.N.Y. 2003) (similar).

"'absolute and unconditional' nature . . . was 'irrespective of . . . any lack of validity of the [underlying agreement] or any other agreement or instrument relating thereto'"); *Navarro*, 25 N.Y.3d at 494 (same). Flacks also "expressly waive[d] and surrender[ed] any defense to [his] liability" under the Guaranty, as well as any "counterclaim or offset of any nature or description which [he] may have . . . ." Guaranty § 6; *see Compagnie Financière*, 188 F.3d at 36 (granting judgment on guaranty because the "waiver of defenses" in the guaranty "was broad enough to encompass" guarantor's release defense); *Navarro*, 25 N.Y.2d at 496 (finding fraud "defense waived under the broad, inclusive, in no way limited, language . . . of the guaranty"). These provisions in the Guaranty are precisely the kinds of "waiver[s] of defenses to a guarantee [that] are routinely enforced by New York courts." *Clarke*, 2023 WL 6806074, at *5 (collecting cases); *Compagnie Financière*, 188 F.3d at 36 (observing that "[a]bsolute and unconditional guaranties . . . are consistently upheld by New York courts" and that "unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims" (quoting *First New York Bank for Business v. DeMarco*, 130 B.R. 650, 654 (S.D.N.Y. 1991))).

Moreover, like the guarantee in *Plapinger*, the Guaranty is "a multimillion dollar personal guarantee" that is undisputedly the product of "extended negotiations between sophisticated business people." 66 N.Y.2d at 95; *see* Flacks SOF ¶¶ 56–62, 71. This is one reason why the Guaranty is distinguishable from the guarantee in *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993), analyzed at length in Flacks's opposition to summary judgment, Opposition at 19–21. In *Yanakas*, the Second Circuit declined to enforce a "generalized boilerplate exclusion" of defenses in a guarantee that came "in a preprinted form" which the bank-beneficiary "used routinely" in executing guarantees of financing transactions like the one it executed with the plaintiff. *Id.* at 317 (explaining that this fact distinguished the *Yanakas* guarantee from the guaranty in *Plapinger*). Unlike the Guaranty here, "[t]here was no evidence" in *Yanakas* "that the scope or character of the

[g]uarantee was the product of any negotiations between the parties." *Id.* Because the Guaranty is "the product of negotiations among sophisticated [parties] that produced custom-crafted instruments," its waivers are distinguishable from those in *Yanakas*. *Valley Nat. Bank*, 254 F. Supp. 2d at 458 (quoting *Frankel v. ICD Holdings S.A.*, 930 F. Supp. 54, 63 (S.D.N.Y. 1996)); *see also ICBC (London) PLC*, 662 F. App'x at 22 (enforcing "multimillion-dollar contract negotiated by sophisticated businesspeople" that waived guarantor's asserted fraud defense and explaining that the facts in *Yanakas* distinguished the guarantee in that case from the one before the court).

In any event, the Guaranty's waivers are considerably broader than the waiver at issue in *Yanakas*. The *Yanakas* court was careful to emphasize that the guarantee before it "[did] not purport to waive any defenses to its own validity," and instead only "absolutely and unconditionally guarantee[d]" the obligations in the underlying agreement. 7 F.3d at 317. The court also observed that the guarantee had "no blanket disclaimer of the type found in *Plapinger* as to 'any other circumstance which might otherwise constitute a defense' to the [g]uarantee." *Id.* (quoting 66 N.Y.2d at 95). Both of the waivers that were lacking in *Yanakas* are present in the Guaranty. In addition to guaranteeing the Upfront Purchase Price regardless of the SPA's "enforceability or invalidity," the Guaranty "expressly waives and surrenders any defense to [Flacks's] liability hereunder." Guaranty § 6. It also provides, as in *Plapinger*, that Flacks's "liabilities and obligations . . . are irrevocable under any and all circumstances." *Id.*; *see* 66 N.Y.2d at 95. The sweeping and unequivocal language in the Guaranty—in addition to the Guaranty's surrounding circumstances— are much closer to the guarantees in *Plapinger* and *Navarro* than to the guarantee in *Yanakas*. *See Clarke*, 2023 WL 6806074, at *6 (distinguishing multimillion-dollar negotiated guarantee with broad waivers from the guarantee in *Yanakas*); *ICBC (London) PLC*, 662 F. App'x at 22 (similar).

Because the Guaranty unambiguously requires payment of the Upfront Purchase Price regardless of any defenses Flacks may have to the enforceability of the Guaranty or the SPA,

Flacks's asserted fraudulent-concealment defense against the enforceability of his guarantee of the Upfront Purchase Price is foreclosed under New York law.

### C.   Flacks Has Not Demonstrated that Summary Judgment is Unwarranted under Fed. R. Civ. P. 56(d)

Flacks's alternative argument that summary judgment is premature because he needs additional discovery pursuant to Fed. R. Civ. P. 56(d) fails because the additional discovery he seeks goes entirely to his foreclosed defense of fraudulent concealment. *See* Opposition at 22–24.  Fed. R. Civ. P. 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to summary judgment], the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  "A party resisting summary judgment on [Rule 56(d) grounds] must submit an affidavit . . . showing:  (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023) (quotation omitted).  Flacks's affidavit in support of his Rule 56(d) request focuses exclusively on his asserted defense of fraudulent concealment.  *See* Flacks Declaration ¶ 8 (stating that Flacks "will seek discovery of facts related to Plaintiff's fraudulent concealment"); *see also id.* ¶¶ 9–11 (specifying the discovery Flacks will seek pursuant to that defense).

Because the Guaranty forecloses any defenses Flacks may have to his liability under the Guaranty, *see supra* Part III.B, no amount of discovery in service of his fraudulent-concealment defense would suffice to defeat summary judgment, *see, e.g.*, *Navarro*, 25 N.Y.3d at 492.  Accordingly, Flacks's request that the Court defer a ruling on Plaintiff's motion for summary judgment under Rule 56(d) is denied.  *See Gualandi v. Adams*, 385 F.3d 236, 245 (2d Cir. 2004) (denying request for additional discovery under Fed. R. Civ. P. 56(f), predecessor to Fed. R. Civ. P. 56(d), because the

nonmovant's affidavit did not show how additional discovery "would impact the court's decision").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED.

Plaintiff is entitled to €5,000,000 plus interest at a rate of 10% per annum accruing from October 3,

2024; €4,506,000 plus interest at a rate of 10% per annum accruing from December 31, 2024; and all

out-of-pocket costs and expenses, including attorneys' fees, that it incurred in obtaining

performance of or collecting those payments.  The amount of Mircal's out-of-pocket expenses and

attorneys' fees will be determined separately.  The parties are directed to submit a joint letter to the

Court no later than August 29, 2025 with their proposals regarding how the Court should determine

that amount.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 18.

SO ORDERED.

Dated:  August 14, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge

25